## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

2019 MAR 15  PM 3: 23

MIDDLE ... RICT OF FLORIDA
TAMPA, FLORIDA

PHILIP KURLANDER, M.D., an individual and
BAKER HILL HOLDING, a New York limited
liability company,

      Plaintiffs,

v.

ROBERT R. KAPLAN, an individual, ROBERT R.
KAPLAN, JR., an individual, LEO KIELY, an
individual, SCOTT MUSIL, an individual, BILL
FIELDS, an individual, and HC GOVERNMENT
REALTY TRUST, INC., a Maryland corporation,

      Defendants.

Case No. 8:19-cv-644-T-30CPT

_____/

### VERIFIED COMPLAINT

Plaintiffs, Philip Kurlander, M.D. ("P. Kurlander"), and Baker-Hill Holding, LLC ("Baker-Hill"), collectively referred to herein as the "Plaintiffs," hereby sue Robert R. Kaplan, Esquire ("Kaplan"), Robert R. Kaplan, Jr., Esquire ("Kaplan, Jr."), Leo Kiely ("Kiely"), Scott Musil ("Musil"), Bill Fields ("Fields"), all of whom are collectively referred to herein as the "Board Defendants," and HC Government Realty Trust, Inc. ("HC REIT"), and allege:

### A.  PRELIMINARY ALLEGATIONS

1.    P. Kurlander is an individual, <u>sui juris</u>, and is a citizen of the State of New York.

2.    Baker-Hill is a New York limited liability company, with its principal place of business and citizenship in the State of New York, and is exclusively owned and controlled by P. Kurlander and his spouse.

3.    Kaplan and Kaplan, Jr. (together, the "Kaplans") are both individuals, <u>sui juris</u>, are father and son, and are citizens of the State of Virginia.


$400
TPA055718

4.     Kiely is an individual, <u>sui juris,</u> and is a citizen of the State of Colorado.

5.     Musil is an individual, <u>sui juris,</u> and is a citizen of the State of Illinois.

6.     Fields is an individual, <u>sui juris,</u> and is a citizen of the State of Texas.

7.     HC REIT is a Maryland real estate investment trust incorporated in the state of Maryland with a principal place of business in Sarasota, Florida, within the Middle District of Florida, and is the general partner of HC Government Realty Holdings, L.P., (the "HC Holdings"), which through a series of special purpose entities ("SPE") holds title to a portfolio of commercial real estate properties throughout the United States. Three (3) of the sixteen (16) real estate holdings currently maintained in HC Holdings' nationwide portfolio are located in the State of Florida.

8.     The HC REIT is engaged in substantial business activity in the State of Florida. As officers and board members of HC REIT, the Board Defendants have had substantial involvement in the business activity and affairs of the HC REIT and related entities, as more fully defined below, since the inception of HC REIT, and have been involved in HC REIT's growth and acquisition activities throughout the State of Florida and abroad. The Kaplans have regularly traveled to Sarasota, Florida in order to interface with the other officers and board members of HC REIT, employees of related entities, discuss the future and growth of the HC REIT business, and otherwise participate in the operation of HC REIT's business activities throughout the State of Florida. Similarly, Fields, Musil, Kiely, have communicated with board members and officers of HC REIT residing in the State of Florida, on a continuous and regular basis since accepting the position of board member for HC REIT. Such communications consisted of (i) e-mail and other electronic communications, and (ii) telephonic board meetings and other less formal telephonic conferences with other board members and Florida based management of HC REIT.

2

9.     As to each cause of action set forth in this complaint (this "Complaint"), this is an action wherein the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

10.     Pursuant to Title 28 of the United States Code § 1332(a)(1), and other applicable law, jurisdiction over this cause exists.

11.     With respect to each cause of action set forth in this Complaint, this is an action to recover damages and obtain related equitable relief pursuant to certain events, circumstances, conditions, and agreements that occurred within the Middle District of Florida.

12.     Pursuant to Title 28 of the United States Code § 1391(b)(2), venue is proper in the Middle District of Florida.

13.     With respect to each count set forth in this Complaint, all requirements and conditions precedent to the bringing of this action have been satisfied, performed, or waived. The causes of action set forth in this Complaint may be pled in the alternative where applicable.

14.     With respect to each cause of action set forth in this Complaint, the conduct hereafter alleged has required the Plaintiffs to retain the undersigned law firm as counsel of record herein, for the purpose of initiating and prosecuting this cause. The Plaintiffs have agreed to compensate its counsel for services rendered and reimburse them for costs incurred in connection with the enforcement of the Plaintiffs' rights and remedies as more fully set forth below. The Board Defendants may additionally be obligated to reimburse the Plaintiffs for attorneys' fees and costs incurred by the Plaintiffs in connection herewith.

## B. OVERVIEW OF CONTROVERSY

15.     The Plaintiffs, together with a matrix of relatives, friends, and business colleagues (collectively, the "Plaintiff-Related Investors") are the largest constituent block of equity interest

3

holders in HC REIT and/or HC Holdings.  P. Kurlander, the Board Defendants[1], and Edwin M. Stanton ("Stanton") constitute the Board of Directors of HC REIT (the "HC REIT Board").  This Complaint focuses on the decision of the Board Defendants to conduct a meeting of the HC REIT Board (the "Disputed Board Meeting") on March 13, 2019.

16.     During the Disputed Board Meeting, a set of actions were voted upon (the "Disputed Board Actions") that have threatened to imminently cause impairment to the Plaintiffs' investment in HC REIT and HC Holdings and cause other significant business interruption and impairment regarding the Plaintiff-Related Investors.  The Disputed Board Actions contemplate HC REIT advancing forward with a lending and equity package (the "Hale Package"), under which it would incur more than $20,000,000 in secured loans at an effective interest rate of fourteen (14%) percent, well above market rate.  HC REIT would also be required to issue substantial equity interests in favor of an opportunistic investor or a set of investors principaled by one Steve Hale (collectively, the "Hale Partnership").

17.     The Disputed Board Actions, if implemented as anticipated, will operate to specially injure the Plaintiffs by effectively removing P. Kurlander from the HC REIT Board, subject existing equity interests to substantial dilution, and burdening HC REIT with unneeded debt at inappropriate rates and unreasonable terms.  Significantly, the Plaintiffs have sought to present significant alternative to the lending and equity package presented by the Hale Partnership (the "Baker Hill Package").

18.     The Disputed Board Actions have now been authorized, but have not yet been taken, such that immediate relief is necessary to preserve the status quo as to the business of HC REIT.  The Baker Hill Package would be beneficial, not only to HC REIT but also to P. Kurlander and his lending and investment entity to advance the Baker Hill Package.  Accordingly, the Plaintiffs and the Plaintiff-

---

[1] Although Kaplan, Jr. has historically not been a member of the HC REIT Board, he has at all times relevant hereto acted in tandem with Kaplan as the president of HC REIT, and was selected as "chairman" of the HC REIT Board expressly for purposes of the Disputed Board Meeting, as defined below.  Moreover, in the Disputed Agenda, and in the Disputed Board Action as ultimately authorized at the Disputed Board Meeting, Kaplan, Jr. is expressly directed to carry out the Hale Package on behalf of HC REIT.

Related Investors will experience separate and unique damages apart from any other shareholders. Finally, Baker-Hill is not only an equity interest holder in HC REIT and HC Holdings, but also strategically holds substantially all of what has been described as the "mezzanine unsecured debt of HC REIT/HC Holdings" (the "Baker-Hill Debt"), and the strategic benefit of the Baker-Hill Debt will be lost as a result of the Hale Package.

### C. **BUSINESS HISTORY OF HC REIT**

19.     Stanton is an experienced real estate professional. Since 2005, Stanton has been involved in the formation of private real estate ventures, syndications, real estate investment trusts ("REITs") and other real estate SPEs holding commercial real estate. During the past decade, Stanton has focused on ventures involving investment in federal government leased real property. On October 26, 2010, Stanton formed EMS-CHI, LLC, a Delaware limited liability company, as an investment vehicle. On August 30, 2011, and after a series of name changes, this entity was renamed Holmwood Capital, LLC ("Holmwood Capital").

20.     Following the formation of Holmwood Capital, Stanton reached out to his long-time attorney and friend, Kaplan, Jr., to discuss its business plan, investment objectives, and working capital goals. Kaplan, Jr. expressed an interest in investing directly, both for himself and with his father, Kaplan. The Kaplans are both partners in the Virginia law firm of Kaplan, Voekler, Cunningham, & Frank, PLC (the "Kaplan Firm").

21.     The Kaplans ultimately invested only nominal funds, but instead purported to invest "sweat equity" in the form of legal services for Stanton and Holmwood Capital.

22.     During early 2011, an informal arrangement was reached at with Holmwood Capital and the Kaplans, through which one investment transaction was completed, closing on September 8, 2011. This "handshake" agreement was predicated upon the Kaplans providing chase capital and free legal services to assist in the preparation of legal documents in furtherance of the emergent venture. A

second transaction was contemplated for which additional mezzanine funding or capital was necessary. Pursuant thereto, Kaplan introduced the Plaintiffs to Holmwood Capital, including its principal, Stanton. Like Stanton, the Plaintiffs are investors who have utilized the Kaplans and the Kaplan Firm as counsel over the years. In relation to this second transaction, Holmwood Capital and the Plaintiffs reached an agreement by which the Plaintiffs provided mezzanine financing. This second transaction closed on May 25, 2012.

23.     After the second transaction successfully closed, a third transaction was contemplated by Holmwood Capital which also required additional mezzanine funding or capital. Plaintiffs were made aware of this need in relation to the third transaction. At that time, Plaintiffs expressed an interest in participating as an equity investor in Holmwood Capital instead of as a lender. During the last quarter of 2012, a series of formal agreements were reached resulting in the following ownership for Holmwood Capital: Kaplan, 15.4858%, Kaplan's trust, Kaplan-Kleiger Trust UA, 4.5884%, Kaplan, Jr., 10.8974%, Stanton's SPE, Stanton Holdings, LLC ("Stanton Holdings"), 5.7355% and Baker-Hill 63.2929%.

24.     By late 2012, the Plaintiffs held virtual control of Holmwood Capital, and the Kaplans paid only nominal sums for their equity.

25.     The Kaplans are transactional attorneys with practices focused in the field of securities, corporate, and real estate law. The members of Holmwood Capital understood that in consideration of the equity provided to the Kaplans described in the preceding paragraph, Kaplans would continue to contribute their personal legal services as a primary component of the consideration for their interests in the common venture (with the exception of the transactional services of the Kaplan Firm, for which the it was compensated).[2]

---

[2] The Kaplans disregarded their obligations under the Virginia Rules of Professional Conduct 1.7 and 1.8, owed to the Plaintiffs, Holmwood Capital, and presumably Stanton, all clients and/or former clients, by failing to explain the inherent conflicts of trading legal services in return for equity in business ventures formed with clients.

26.     During the ensuing timeframe, the Plaintiffs began with a significant upfront investment to capitalize Holmwood Capital.   Stanton continued to provide full time day to day leadership and operational support for Holmwood Capital.

27.     The organizational documents of Holmwood Capital, including the organizational documents formalizing the business relationships of Kaplan, Kaplan-Kleiger Trust UA, Kaplan, Jr., Stanton Holdings, and Baker-Hill were drafted by Kaplans.  Accordingly, in all respects, not only did the Plaintiffs, and Stanton Holdings, but also Holmwood Capital, looked to the Kaplans and the Kaplan Firm for advice and drafting of the required documents.[3]  The organizational and other documents were not explained to the other members. The Kaplans directed them to "just sign" because there was "only one way of doing it" and "that was the way it needed to be done."

28.     With Holmwood Capital formed and well capitalized, it acquired a total of seven (7) commercial properties over the next several years.  The Plaintiffs were there, during this acquisition process, with adequate capital to fund the ongoing roll-out. At this point, the assets of Holmwood Capital, included seven (7) government leased real properties totaling approximately $35,000,000.  The Plaintiffs' capital, and Stanton's investor knowledge and acumen, made the acquisitions possible.

29.     During the time that Holmwood Capital was accumulating properties, Stanton Holdings, the Kaplans, and Plaintiffs formed an independent management company equally owned (twenty-five (25%) percent each) called Holmwood Capital Advisors, LLC ("HC Advisors").  HC Advisors acted as the management company to Holmwood Capital.  Shortly after formation, and in

---

[3] At no point did the Kaplans or anyone at the Kaplan Firm discuss with Stanton or the Plaintiffs the issues inherent in two partners representing the two other partners and the common venture simultaneously for purposes of corporate, securities, and real estate representations. Certainly, no formal conflict waiver was presented, much less obtained, in relation to the Kaplans transactions with Stanton, the Plaintiffs, or Holmwood Capital.  Rather, the Kaplans presented their legal services as saving time and money for Holmwood Capital in lieu of it or its other members from using outside counsel, because all members interests were "aligned."

addition to its management activities, HC Advisors sought potential third-party capital sources to partner with Holmwood Capital.

30.     The organizational documents of HC Advisors, including the organizational documents formalizing the business relationships of the Kaplans, Stanton, and the Plaintiffs were drafted by Kaplans. Accordingly, in all respects, not only the Plaintiffs, but now also HC Advisors, looked to the Kaplans and the Kaplan Firm for advice and drafting of the required documents.[4] Again, the Kaplans presented their legal services as saving time and money for Kaplans in lieu of it or its other members from using outside counsel, because all members interests were "aligned." The organizational and other documents were not explained to the other members. The other members were directed to "just sign" because there was "only one way of doing it" and "that was the way it needed to be done."

31.     Kaplan, Jr. and the Kaplan Firm have held themselves out as having played a significant role in the enactment of certain legislation involving Regulation "A." The Kaplans and the Kaplan Firm have held themselves out as securities experts. The Kaplans insisted that a new entity be formed for purposes of taking advantage of Regulation "A" to raise capital.[5] Qualification of an offering under Regulation "A" Tier 2 enables small business entities to raise capital without the full burden of being a publicly listed company. Under this regulation, up to $50,000,000 can be raised over a trailing twelve (12) month period.

32.     With the uninformed consent of director P. Kurlander and Stanton, the Kaplans and the Kaplan Firm formed new entities, HC REIT and HC Holdings, both of which are collectively referred to as the "HC Entities." The HC Entities were initially held approximately equally by each of the

---

[4] At no point did the Kaplans or anyone at the Kaplan Firm discuss with Stanton or the Plaintiffs the issues inherent in two partners representing the two other partners and the common venture simultaneously for purposes of corporate, securities and real estate representations. Certainly, no formal conflict waiver was presented, much less obtained, in relation to the Kaplans transactions with Stanton, Plaintiffs, or HC Advisors.
[5] Kaplans represented that they had recommended this path to several other clients and would go on to advocate this approach on various trade and legal panels. However, Kaplans did not fully disclose to Stanton and the Plaintiffs the extent of the restrictions, limitations, and potential "pitfalls" relating to this course of action.

Kaplans, Stanton, and P. Kurlander (the "Partners"), directly or through business entities they essentially control.

33.     As structured by the Kaplans, HC REIT was the general partner of the operating partnership, HC Holdings with its limited partners Holmwood Portfolio Holdings LLC and Holmwood Capital, LLC (together, the "Limited Partners"). HC REIT and affiliated entities were and continue to be managed by HC Advisors pursuant to a management agreement drafted by the Kaplans and the Kaplan Firm.

34.     In connection with the formation of HC REIT, the Kaplans advised Plaintiffs and Stanton that a board of directors was necessary for HC REIT, including a majority independent board (collectively, the "Independent Directors"). The Kaplans further opined that a high-profile independent board would be critical to capital raising efforts through the sale of common stock. In response, the Plaintiffs and Stanton expressed their grave concerns with the risk of losing control to an independent board. The Kaplans insisted that the independent directors would be experienced, sourced through personal relationships, and would not negatively interfere with the responsible growth and management of the entity. Finally, the Kaplans further represented that the Independent Directors would respect a pre-existing management contract that HC REIT had established with HC Advisors (the "Advisors Management Contract").

35.     P. Kurlander, Kaplan and Stanton ultimately served as directors of HC REIT with four (4) Independent Directors, for an HC REIT Board total of seven (7) directors.[6] Independent Directors were primarily sourced by the Kaplans. The Plaintiffs were not provided a meaningful opportunity to

---

[6] The Independent Directors joined the HC REIT Board with the express provisio that they would each receive compensation of $40,000 annually. However, after the first year, they received no compensation and are presently serving with no apparent promise of compensation, at least as far as the Plaintiffs know. This understandably contributes to malaise and indifference; however, this is no justification for gross disregard of their fiduciary duty to the Plaintiff and the Plaintiff-Related Investors, not to mention more than $8,000,000 invested by unaligned investors who have no tie to the Plaintiffs or the Kaplans.

participate in sourcing any Independent Directors. As to leadership of HC REIT, Stanton was elected to serve as the chief executive officer, Kaplan, Jr. appointed himself to serve as the president, Kaplan was elected to serve as secretary, and P. Kurlander was elected to serve as treasurer.

36.     On November 7, 2016, the Securities and Exchange Commission approved the qualification of the HC REIT's Regulation A Tier 2 securities offering.

37.     HC REIT thereafter began its marketing efforts to sell its common stock securities. In May of 2017 the company had its initial closing on its public offering in the amount of $3,000,000. HC REIT continued its capital raise efforts with subsequent closings on a periodic basis.

38.     Included in HC REIT's total equity capitalization to date are the Plaintiff-Related Investors.

39.     In the beginning of 2018 HC Advisors engaged BB&T Capital Markets to source an institutional investor to supplement the capital raising efforts of HC REIT.[7] After several months BB&T introduced the Hale Partnership to Kaplans. Over the next several months Kaplans negotiated

---

[7] At this time, the Plaintiffs learned that the Kaplans had documented the relationship among the Partners in a manner reflective of gross self-dealing. When the Plaintiffs and Stanton expressed their interest to invest additional capital into HC Advisors in exchange for additional equity, and thus dilute the remaining Partners, the Kaplans objected. For the first time, they pointed out to the Plaintiffs that the organizational documents contained anti-dilution provisions that precluded dilution of their interests. While there was no prohibition against lending directly to HC Advisors, interest rates are not sufficient in the context of further capitalizing HC Advisors to generate the anticipated return on capital. With anti-dilution language having been discovered, the Plaintiffs inquired of the Kaplans how such language could have been incorporated into the documents when it was not discussed among the Partners. The Kaplans together acknowledged having specifically drafted the governing documents so as to prevent dilution of their interests. Stanton objected that this would frustrate the purpose of HC Advisors, and P. Kurlander objected that he never would have invested in the first place if he thought for a minute that his percentage of ownership and control would be forever tethered to the other Partners who had more limited resources and ability to fund HC Advisors. When Plaintiffs and Stanton brought this self-dealing to the attention of the HC REIT Board in September 2018, Kaplan responded "you executed the documents." In rapid reply, the Plaintiffs answered "you advised us to execute documents as our counsel." Both of the Kaplans laughed and said, "we advised you to execute as your partners." In point of fact, the Kaplans were both partners of the Plaintiffs and lawyers for the Plaintiffs and for HC Advisors and the HC Entities. The Kaplans resolved the inherent conflict regarding anti-dilution language by concealing the conflict from the Plaintiffs and drafting in a manner that best fit their own personal business and financial objectives. Moreover, when confronted by the Plaintiffs about the conflict of interest, they further entrenched themselves rather than correct their misconduct.

multiple iterations of a term sheet with the Hale Partnership against the wishes of Plaintiffs and Stanton. These negotiations ultimately culminated into the Hale Package.

40.    Notwithstanding that such a presentation of a financing opportunity should have been approved by HC Advisors prior to consideration by the HC REIT Board, and because of Plaintiffs and Stanton's disapproval of the same, Kaplans circumvented HC Advisors and brought a prior iteration of the Hale Package for consideration to the HC REIT Board in August 2018.

41.    Shortly thereafter Kaplans called a meeting of the HC REIT Board in order to discuss the prior iteration of the Hale Package. Prior to that meeting, the Plaintiffs submitted through Stanton an alternative capital proposal, the first iteration of what would become the "Baker Hill Package." Prior to consideration of either package, Independent Director O'Reilly had resigned, leaving an even number of directors and allowed the possibility of deadlock.

42.    The final iteration of the Baker Hill Package included favorable terms as follows:

    a.   $14,300,000 in a combination of unsecured debt and Series B preferred equity at a blended cost of 9.95% or $14,300,000 of only Series B preferred equity at a blended cost of 8.98%;

    b.   Deferred monthly payment and flexibility regarding repayment of loans and preferred equity;

    c.   No change of HC REIT Board control of the company was required;

    d.   The capital provided under either of the two above options did not cause the company to take on any more mezzanine debt or equity than was necessary for continued near-term operations;

    e.   Key Bank credit facility of $200,000,000 sourced by Stanton through HC Advisors;

    f.  HC Advisors would be replaced by a new entity created by the Plaintiffs and Stanton where new management would bear all of the marketing and capital raising expenses on behalf of HC REIT.

43.    The HC REIT Board was deadlocked after Hale Partnership and the Plaintiffs presented the final iteration of the Hale Package and the Baker-Hill Package.[8]

44.    Given the deadlock and the ongoing disagreement between Plaintiffs, Stanton and Hale concerning the Hale Package, Plaintiffs and Stanton entered into separate negotiations with Hale. Hale ultimately agreed to redeem the equity interests of the Plaintiffs, Stanton, and the Plaintiff Related Investors as part of moving forward with his investment. As part of the revised plan, HC Advisors' management agreement was to be terminated without cause triggering a termination fee to be paid at closing. Together, these contingencies, terms, conditions and other modifications to the Hale Package rendering that package agreeable to the Plaintiffs and Stanton is referred to herein as the "Agreed Hale Package". In January 2019, the HC REIT Board approved the general business terms of the Agreed Hale Package, subject to a fairness opinion by an independent investment bank to support the proposed redemption price for Plaintiffs and Stanton. The Plaintiff-Related Investors were to be redeemed at par.

45.    The repurchase prices for P. Kurlander, Stanton, and their affiliates was agreed at $25.00 per share of Series A Preferred Stock and $9.10 per share of common stock or OP Unit.

---

[8] During the last quarter of 2018, P. Kurlander and Stanton continued to express a concern that the Kaplan Firm was experiencing a conflict of interest because it was representing HC REIT, receiving large payments purportedly on account of legal services professionally rendered, but the Kaplans, two partners within the Kaplan Firm, were not only interest holders but were sponsoring the deadlock as officers and on the HC REIT Board. With equity unearned in HC REIT, the Kaplans were in control of legal advice and were utilizing that unique position to their advantage at the expense of the founders who brought them to the venture. The pretense of imposing a "Chinese Wall" purportedly between the Kaplan Firm's lead named partner and his son on one side, and the lawyers purportedly advocating for the Hale package on the other, was transparent in such a way as to render it an absurdity. Protestations of P. Kurlander and Stanton notwithstanding, the Kaplans and the Kaplan Firm continued on as if the glaring conflict issue were irrelevant.

Repurchase prices for the Plaintiff-Related Investors was agreed at $25.00 per share of Series A Preferred Stock and $10.00 per share of common stock.

46.     Shortly after the HC REIT Board's approval of the Agreed Hale Package, an investment bank (the "Investment Bank") was engaged to render the fairness opinion.  On March 8, 2019, still pending a fairness opinion, Kaplan, Jr. and several Independent Directors had a call with the Investment Bank to discuss preliminary findings.  On March 9, 2019, Kaplan, Jr. relayed to Plaintiffs and Stanton that the initial fairness opinion resulted in a $6.50-$7.50 repurchase share price, significantly below the agreed to $9.10 repurchase share price.  Plaintiffs and Stanton were provided no supportive documentation as to how the investment bank arrived at this range.

47.     Given the initial indications relating to the fairness opinion, Kaplans, the Plaintiffs and Stanton engaged in discussions on Monday, March 11, 2019 regarding the fairness opinion as well as other potential concepts for resolution.  Kaplan interrupted the discussions and instead insisted that the HC REIT Board had directed Kaplan, Jr. to ascertain the Plaintiffs and Stanton's willingness to accept the range purportedly established in the incomplete fairness opinion.

48.     The Plaintiffs, having been provided no written documentation concerning the purported fairness opinion, and little time to consider the finding orally relayed by the Kaplans rejected the reduced redemption share price.

49.     Kaplans refused to further discuss other potential concepts for resolution or to further discuss the quality of the fairness opinion, indicating that the HC REIT Board must first receive a "yes" or "no" as to the reduced redemption share price. However, Kaplans and the HC REIT Board had ulterior motives for this delay.

D.     **THE DISPUTED BOARD MEETING AND THE DISPUTED BOARD ACTIONS**

50.     On March 11, 2019, Musil forwarded to the HC REIT Board a sixty-nine (69) page memorandum of Elizabeth Watson, the former CFO of HC REIT, (the "Watson Memorandum"), a

copy of which is attached as Exhibit "A." The Watson Memorandum goes into great detail to explain all of the reasons why the Hale Package is not favorable for HC REIT, for common stock shareholders, or for any other constituencies. Not insignificantly, the largest single block in terms of equity or debt of HC REIT and/or HC Holdings remains that of the Plaintiffs as well as the Plaintiff-Related Investors, all of whom have been brought to this opportunity by P. Kurlander and Stanton. For reasons that can only be the subject of speculation at this juncture, the Kaplans did not publish the Watson Memorandum, that had been prepared by Ms. Watson and sent to Kaplan, Jr. on March 5, 2019. Because of the complexity of the Watson Memorandum, it would be very difficult for an investor to thoroughly vet all of the issues raised; however, there was no attempt to do so because the Board Defendants were indifferent to its conclusions.

51.     On March 12, 2019 at 10:43 a.m. EST, Kaplan, on behalf of the HC REIT Board, provided a notice of the Disputed Board Meeting, set for 11:15 a.m. EST on March 13, 2019, a copy of which is attached as Exhibit "B." It is noteworthy that this notice provided P. Kurlander as a member of the HC REIT Board, with approximately thirty-two (32) minutes more than the minimum required notice under the Organizational Documents.

52.     On March 12, 2019 at 7:44 p.m. EST, Kaplan, purportedly on behalf of the HC REIT Board, disseminated by email a 121-page agenda for the Disputed Board Meeting (the "Disputed Agenda"), a copy of which is attached as Exhibit "C." Although the Disputed Agenda contained documents and included topics that had been vetted in prior meetings of the HC REIT Board, numerous material changes existed, many being fundamentally determinative of the future of the entity, and no advance notice or red-line was provided. Moreover, no effort was made to clear the time for the meeting, it being noted that P. Kurlander is known to the entire HC REIT Board to be actively engaged as a physician in the State of New York in the practice of anesthesiology. In the history of the HC

14

REIT Board, virtually no meetings have occurred in a manner that would foreseeably interrupt P. Kurlander's surgery schedule.

53.     The Disputed Agenda contained the following material terms and conditions that constitute the Hale Package:

    a.   Authorization of the Kaplans to finalize the necessary documents associated with the Hale Package, who by this time had been richly rewarded for their multiple breaches of fiduciary duty and duty of loyalty to the Plaintiffs and Stanton;

    b.   Making of a secured loan for up to $20,500,000 from the Hale Partnership to HC REIT at fourteen (14%) percent interest;

    c.   Issuance of 2,050,000 shares of preferred series "B" shares of HC REIT to Hale Partnership at $10/share (aggregate purchase price of $20,500,000);

    d.   Issuance of 300,000 shares of common stock shares of HC REIT to Hale Partnership at $10/share (aggregate purchase price of $3,000,000);

    e.   Termination of Stanton as the CEO of HC REIT;

    f.   Termination of P. Kurlander as Treasurer of HC REIT;

    g.   Approval of the Amended Investment Guidelines of the Management Agreement, having the practical effect of making it impossible for the Plaintiffs and Stanton to be involved in investment decisions for HC REIT;

    h.   Approval of the decision to provide notice of termination of the management agreement of HC Advisors, with predictable negative consequence for both HC REIT and HC Advisors, a business entity in which the Plaintiffs have significant ownership and control;

The Disputed Agenda contained other topics and items that were not as materially significant to the subject matter of this Complaint, but the inclusion of key features above is not intended to omit any actionable component within the Disputed Agenda.

54.     The Hale Package, as provided for in the Disputed Agenda, would have the following impact on the Plaintiffs, beyond the obvious consequences reflected above:

   a.  If implemented, the Hale Package would trigger defaults under the Baker-Hill Debt, such that it would have to be satisfied by HC REIT and/or HC Holdings. This is a negative development for Baker-Hill because the investment is a favorable investment for Baker-Hill and provides an element of indirect control over the entity. HC REIT is not obligated to incur debt unnecessarily under its terms. Additionally, because the applicable interest rates are comparatively lower than the Hale Package, HC REIT is conversely benefitted by the Baker-Hill Debt. Finally, as reflected in the comparative debt chart (the "Secured-UnSecured Chart") attached hereto as Exhibit "D," the Baker-Hill Debt is unsecured, whereas the Hale Package is secured.

   b.  If implemented, the Hale Package would place the Hale Partnership in majority control of applicable classes of voting stock of HC REIT, with the eventual removal of P. Kurlander, among others, being a fait accompli, such that P. Kurlander, the largest single equity interest holder and existing creditor of HC REIT, will be effectively frozen out of the business he helped form.

   c.  If implemented, the Hale Package would cause HC REIT to be obligated for interest on significant loans at a rate in excess of market rate, in amounts more than is actually required for the purposes of prudent business growth and investment strategy of HC REIT, such that the interest obligation going forward would be substantially greater than needed.

d.  If implemented, the Hale Package would dissipate significant existing equity enjoyed by the Plaintiffs and those closely related to or in business with them, damaging what had been planned as a strategic controlling interest in the subject entity.

55.     At approximately 11:15 a.m. EST on March 13, 2019, Kaplan convened the Disputed Board Meeting, at which Stanton and all of the Board Defendants appeared, either in person or telephonically.  Predictably, P. Kurlander was in surgery and unable to attend.  Kaplan had been informed by P. Kurlander on the prior evening that his surgery schedule could not be modified to accommodate the abruptly scheduled Disputed Board Meeting.

56.     At the outset of the Disputed Board Meeting, Stanton was recognized as requested by Kaplan, Jr., and thereupon made a statement substantially if not identically as follows:

> I am pleased to have been able to attend this meeting telephonically given the extraordinarily short notice. Unfortunately, Dr. Kurlander is in surgery, as usual something that you all had undoubtedly understood. Nevertheless, the meeting was called unilaterally without attempting to accommodate his practice.  The matters that we are called to discuss today are extraordinarily significant matters, particularly to myself and to Dr. Kurlander.  And yet we did not receive the 121 page board document until late yesterday evening.  Clearly if you had an agenda that involves so much of importance, and covered so many pages, it would've been quite easy to provide a two or three page agenda a week ago so that we could've adequately vetted the topics together as a group, and also with our separate counsel. Under the circumstances, this meeting, and the circumstances under which it was called, appear to me to be extremely contrived.  For this reason, and based upon the substance as I understand it, recognizing that I've had only a few hours to consider the situation, I am sure it will come as no surprise that I will vote against this entire package.  But we will be doing the best we can in the coming days and weeks to continue some form of dialogue with a goal of reaching some form of resolution if at all possible.  I would only ask, as a final observation on this point, that all further decision making on these points be continued for a period of at least one week so that all appropriate alternatives could be considered, and so that we can discuss the situation amongst one another and with counsel.  Thank you for your consideration.

In response to the foregoing statement, Kaplan, with the remaining Board Defendants joining in, initially gave short shrift to Stanton's request for a one-week continuance. Fields requested that Stanton further comment on his reasons for the requested continuance for the benefit of P. Kurlander. That request was next reduced by Stanton to twenty-four (24) hours. In the end, Stanton was not even provided a fifteen (15) minute recess to attempt to contact P. Kurlander in surgery.

57.     After rejecting Stanton's requests to defer consideration of the Disputed Agenda, the HC REIT Board thereupon approved all items presented for consideration, ultimately paving the way for the Hale Package and all that goes with it. Stanton was the sole dissenter.

58.     As of the date of filing this Complaint, the Kaplans are presently authorized to execute all documents required to implement the Hale Package, and have indicated that they wish to do so as soon as possible, within a matter of a few days at the most. On March 14, 2019, Kaplan wrote Stanton to confirm that HC Advisors management contract was being terminated, approximately 24 hours after the conclusion of the Disputed Board Meeting. The notice, a copy of which is attached as Exhibit "E," leaves no doubt as to the imminence of implementation of the Disputed Board Actions.

59.     One way to rapidly appreciate the impact of the Hale Package on Plaintiffs' position vis-à-vis HC REIT before and after hypothetical implementation of the Hale Package is to refer to the comparison charts (the "Dilution Charts") attached hereto as Exhibit "F." The first of the Dilution Charts reflects the fact that the Plaintiffs, together with the Plaintiff-Related Investors, presently possess a moiety of the aggregate equity of all classes of equity of HC REIT and/or HC Holdings. The second of the Dilution Charts reflects the fact that the Plaintiffs, together with the Plaintiff-Related Investors, would have a minority of the aggregate equity of all classes of equity of HC REIT after implementation of the Hale Package.

60.     Presumably, the next step after implementation of the Hale Package would be that HC REIT would be required to continue borrowing quantities of money not required at rates that are not

reasonable for the amount of money involved, thereby further depleting shareholder value. Of course, the loss of control position for P. Kurlander and others relying upon him would be materially greater and substantially distinct. Alternatively, a Hale Partnership-controlled HC REIT Board could elect to pay back funds, recognizing that part of the consideration for issuance of a controlling share stock block was the unneeded funds being lent. Either way, the entire proposition is singularly aimed at damaging and otherwise altering Plaintiffs' position vis-à-vis HC REIT.

### COUNT I: DISSOLUTION

61.     This is an action for statutory dissolution under § 3-413 of the Code of Maryland based upon the above-described conduct of the Board Defendants, substantially defeating the reasonable expectations of the Plaintiffs (the "Oppressive Conduct").

62.     The Plaintiffs reincorporate by reference the allegations contained in paragraphs 1 through 60 above as though fully set forth herein.

63.     Some or all of the Plaintiffs are stockholders entitled to vote in the election of directors of a corporation and therefore have the statutory right to petition this Court to dissolve the HC REIT given the fact that the acts of the Board Defendants in their control of the HC REIT constitute illegal, oppressive, and/or fraudulent acts.

64.     The Plaintiffs have been aggrieved by conduct of the Board Defendants, that is a legal, oppressive, and/or fraudulent, and that runs contrary not only to the interests of the Plaintiffs but also the Plaintiffs-Related Investors, and other investors representing no less than $8,000,000 of equity in HC REIT, who have no knowledge of the Disputed Board Actions or their logical ramifications.

65.     The only interests that have militated in favor of the Disputed Board Actions are (a) the Kaplans, who paid a minimal amount for a small portion of their equity interest, and utilized their position as counsel for personal lucre for themselves and the Kaplan Firm, (b) a set of apathetic and careless Independent Directors, those being Musil, Kiely, and Fields, who have not been paid for their

services, and therefore seem to have spent very little time reading the Watson Memorandum, and (c) the Hale Partnership, that is little more than an opportunistic investor, having presented the Hale Package that involves funding a loan on undesirable terms, in exchange for a controlling equity interest in the borrower, HC REIT, which does not require all of the money being lent, it being additionally noted that the Hale Partnership has no previous relationship and no present equity interest that should be the object of fiduciary concern. None of these three interests should trump the legitimate interests of the Plaintiffs, or the interests of other investors who either support the actions of the Plaintiffs herein or are completely oblivious to the irresponsible decisions that occurred at the Disputed Board Meeting.

66.    The Watson Memorandum recommended dissolution of HC REIT's real estate portfolio, and this is preferable for all legitimate equity interest holders, if the only other alternative is implementation of the Hale Package.

WHEREFORE, the Plaintiffs request judgment against the Board Defendants, for damages, equitable, and other relief, including punitive damages, pre- and post-judgment interest, attorneys' fees, costs, and such other or further relief as is appropriate under the circumstances.

## COUNT II:  BREACH OF FIDUCIARY DUTY

67.    This is an action for damages against the Board Defendants resulting from the breach of fiduciary duty of the Board Defendants owed to the Plaintiffs as controlling number of directors on the HC REIT Board.

68.    The Plaintiffs reallege and incorporate by reference paragraphs 1 through 60 of this Complaint as though fully set forth herein.

69.    The Board Defendants, individually and in combination, intentionally or recklessly convened the Disputed Board Meeting in such a way as to deliberately exclude P. Kurlander from the process. Without P. Kurlander, and with only Stanton to appeal to the best interest of HC REIT, the Board Defendants only paid lip service to the best interests of equity, ignoring the fact that the Plaintiffs

were the largest block of equity (together, with the Plaintiff-Related Investors, approximately fifty percent of the equity interest in HC REIT and/or HC Holdings) and were being effectively marginalized in a business venture that they funded from the outset.

70.     P. Kurlander, as a family member, friend, business associate, and in some cases in multiple such capacities, has been involved in the circumstances under which the Plaintiff-Related Investors became aware of HC REIT, and came to invest in it. The personal embarrassment, family frustration, business strain, and potential liability stemming from the loss of control of a business venture that he and Stanton founded, presents a unique hardship for P. Kurlander. All of the Board Defendants have at all times been acutely aware of these special relationships, and have exploited the fact that P. Kurlander has wanted to avoid controversy and resolve these matters without litigation. That is exactly why they Board Defendants had the temerity and hubris to conduct the Disputed Board Meeting and advance the Hale Package in the way that they have done.

71.     The decisions at the Disputed Board Meeting were made by the Kaplans, two lawyers who paid a marginal amount for the limited stock they have in the HC REIT, and utilized their sensitive positions as "counsel to the deal" to betray all who relied upon them in order to advance their own individual interests. The Independent Directors, with limited information and a willingness to look in the other direction, relented as urged by the Kaplans. Moreover, the Board Defendants failed to continue the Disputed Board Meeting so as to more fully consider the merits of the Baker Hill Package. Additionally, the Board Defendants approved all items in the Disputed Agenda, including the authorization to the Kaplans necessary to fully implement the Hale Package.

72.     Throughout the applicable time period, the Plaintiffs actually and reasonably reposed great trust and confidence in the Board Defendants. The Board Defendants knowingly accepted the responsibility that the Plaintiffs placed in the Board Defendants for this purpose. The Board

Defendants thereafter breached their duty by failing to properly respond to the Hale Package and the Baker-Hill Package (together, the "Competing Packages").

73.     The Board Defendants were ultimately loyal only to themselves, and failed to protect the interests of the Plaintiffs as a fiduciary is obligated to do, or otherwise relay the conflict to the Plaintiffs.  The Board Defendants knew or should have known their actions breached their fiduciary duty owed to the Plaintiffs, and the Plaintiffs have been damaged in the amount of lost profits.

WHEREFORE, the Plaintiffs request judgment in the amount of lost profits against the Board Defendants, together with interest, court costs, and reasonable attorneys' fees and costs recoverable, and for such other and further relief as is appropriate under the circumstances.

## COUNT II:  DECLARATORY RELIEF

74.     This is an action for declaratory relief under the "Declaratory Judgment Act," codified at 28 U.S.C. § 2201, as well as Federal Rule of Civil Procedure 57, relating to the Disputed Board Meeting and the rights and duties of the Kaplans in light of the Board Defendants' passage of items on the Disputed Agenda, including implementation of the Hale Package.  For purposes of this Complaint, the controversy as between the Plaintiffs and the Board Defendants relating to the Disputed Board Action is referred to as the "Controversy."

75.     The Plaintiffs reincorporate by reference the allegations contained in paragraphs 1 through 60 above as though fully set forth herein.

76.     There is a bona fide, actual, present practical need for a declaration of the rights and duties of the Plaintiffs and the Board Defendants with respect to the Controversy.

77.     The facts surrounding the Controversy are readily ascertainable and can be readily established.  The Plaintiffs and the Board Defendants require timely adjudication of the Controversy as the status of current business, financial, and legal affairs continue to create an unacceptable situation

22

for all involved.  The rights of the Plaintiffs and the Board Defendants (together, the "Parties"), and other interested parties, are dependent upon the adjudication of the Controversy.

78.     The Parties are all before this Court, and thus this is the correct forum in which to determine the rights of the Parties.

79.     A range of equitable considerations, including a weighing of the relative burdens on the Parties to this proceeding, and the equitable nature and authority of the Court, dictate that declaratory relief regarding the Controversy is appropriate at this time.

80.     It cannot be reasonably disputed that:

a.  the Hale Package is contrary to the best interest of the HC REIT, and all equity interest holders generally;

b.  the Hale Package, if implemented, would work a unique and deliberate hardship on the Plaintiffs, based upon not only their equity position but their debt position vis a vis the HC REIT;

c.  the Baker-Hill Package, formulated by the Plaintiffs as a far more attractive alternative to the Hale Package, has been ignored by the Board Defendants, either out of a deliberate breach of fiduciary duty or out of wanton gross negligence;

d.  the circumstances under which the Disputed Board Meeting occurred were deliberately calculated to exclude P. Kurlander from participation, and were in furtherance of an uninterrupted pattern of oppression of the Plaintiffs that has intensified in light of the devious, self-serving, unethical, and indeed tortious legal advice provided by the Kaplans and related drafting;

e.  in light of all of the foregoing, any action by any of the Board Defendants, whether or not expressly authorized as a result of decisions reached at the Disputed Board Meeting, would be ultra vires, and should be deemed void ab initio; and

23

    f.   that the status quo ante must be maintained until such time as an appropriate fiduciary, such as a receiver appointed by this Court, can assume responsibility for the orderly dissolution of HC REIT in connection with the liquidation of the commercial real estate portfolio that Stanton and the Plaintiffs have accumulated to date.

81.    The Controversy presented in this Count is ripe.  The Parties are unsure as to their relative rights and remedies as to the Controversy.  The Parties require this Court's declaratory relief in order to proceed.

WHEREFORE, the Plaintiffs requests declaratory judgment regarding all aspects of the Controversy, in its favor and against the Defendants, consistent with all of the foregoing, and all other appropriate relief.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all counts so triable.

Dated this 15th day of March, 2019.

/s/ John A. Anthony
**JOHN A. ANTHONY, ESQUIRE**
Florida Bar Number:  0731013
janthony@anthonyandpartners.com
**ANDREW J. GHEKAS, ESQUIRE**
Florida Bar Number:  0119169
aghekas@anthonyandpartners.com
**LYDIA M. GAZDA, ESQUIRE**
Florida Bar Number:  0071842
lgazda@anthonyandpartners.com
Anthony & Partners, LLC
201 N. Franklin Street, Suite 2800
Tampa, Florida 33602
Telephone:813/273-5616
Telecopier:  813/221-4113
Attorneys for the Plaintiffs

## VERIFICATION

STATE OF *New York*

COUNTY OF *Nassau*

I, Dr. Phillip Kurlander, hereby declares under penalty of perjury under the laws of the United States that the information contained in this Verified Complaint is true and correct, provided that this declaration does not extend to statements consisting on an analysis of law governing the merits of this Complaint about which I am unqualified to opine because I am not a member of the Bar of any jurisdiction.

**Dr. Phillip Kurlander**

STATE OF *New York*

COUNTY OF *Nassau*

The foregoing instrument was sworn and subscribed before me, this *15* day of March, 2019, by Dr. Phillip Kurlander. He is personally known to me or provided *NYS Driver's license* as identification.

Notary Public
My Commission Expires:

DAVID S. DENDER
Notary Public, State of New York
No. 41-4900685
Qualified in Queens County
Commission Expires June 22, 18.2019

*Nassau*

25